**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 97-51051

UNITED STATES OF AMERICA

          Plaintiff-Appellee,

versus

DUDLEY EDWARD VANDERGRIFF

          Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas
(P-97-CR-66-1)

February 17, 1999

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

Defendant-appellant, Dudley Vandergriff, appeals his conviction for possession of a firearm by a felon. On appeal, Vandergriff contends that his warrantless arrest was without probable cause, and therefore the evidence seized pursuant to his arrest should have been suppressed. Vandergriff also appeals his alleged denial of his right to waive counsel and represent himself at trial. Because we conclude that Vandergriff was denied his Sixth Amendment right to self-representation, we do not reach the issue of the constitutionality of his warrantless arrest. We,

---

[*]Pursuant to 5th CIR.R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th CIR.R. 47.5.4.

-1-

therefore, vacate and remand.

The record evidence tends to prove the following facts. On April 27, 1997, members of an organization known as the "Republic of Texas" kidnaped two residents of the Fort Davis Resort at gunpoint in their home. The members occupied the home and held the residents captive for a number of hours until Texas Department of Public Safety (TDPS) officials negotiated a release of the hostages in return for permitting the kidnappers to return to the "Embassy of the Republic of Texas."[1] On April 29, the "Republic of Texas" issued a "call to arms" over the Internet, commanding defense forces to proceed to Balmorhea, Texas where they would be met by other militias. The day after this "call to arms," the Pecos Police Department (PPD), received a teletype from TDPS that indicated that a tan Suburban containing four males was traveling west on Interstate 20, presumably in response to the call to arms. The teletype instructed the police to "DEVELOP OWN PROBABLE CAUSE FOR STOP . . . ." Balmorhea is approximately 45 miles South of Pecos.

The PPD observed not only the Suburban as it entered Pecos, but also a blue Oldsmobile that appeared to be traveling with the Suburban. An officer of the PPD followed the vehicles until they stopped at a truck stop ("Flying J"). According to the record, the Oldsmobile followed close behind the tan Suburban, and pulled alongside the Suburban after entering the parking area of the

_____

[1]The "Embassy" was essentially a shack-like structure located in the Davis Mountains near Fort Davis, Texas.

Flying J. Thereafter, the occupants of the vehicles appeared to have a conversation. After the vehicles parked, five white males exited the vehicles and entered the Flying J.

The Texas Rangers met the PPD at the Flying J and observed that the license plate of the Suburban matched the license plate number in the teletype. As the Rangers approached the Oldsmobile and Suburban, they observed two male passengers, one asleep in the Oldsmobile and one asleep in the Suburban, and a partial view of a gun barrel in the rear portion of the Suburban.

The officers woke the sleeping occupants of the Oldsmobile and Suburban and told them to exit the vehicles and lie on the ground. The officers then proceeded to handcuff the occupants. As these events transpired, two of the males that had entered the Flying J happened to exit, one of whom was Vandergriff. The officers instructed them to lie on the ground, and they were subsequently handcuffed. Thereafter, the officers entered the Flying J and escorted the remaining three men outside and ordered them to lie on the ground, and they were handcuffed. The officers then transported all of the handcuffed individuals to the Revees County Sheriff's Office. Additionally, the officers impounded the Oldsmobile and Suburban, and brought them to the Revees County Sheriff's Office.

After an inventory search of the vehicles at the Sheriff's Office, the officers found several weapons, ammunition, paramilitary gear with ROT insignia, and ROT paraphernalia in both vehicles. Items that were specifically found in the Oldsmobile

-3-

were two loaded SKS rifles, hundreds of rounds of ammunition, a military backpack with supplies, low grade explosive powder, and Kevlar helmets, all located in the trunk; as well as title information that indicated that the car belonged to Mrs. Elizabeth Vandergriff, Vandergriff's mother, and a Bible that was inscribed "Presented to Dudley Vandergriff."

At the Sheriff's Office, approximately eight an a half hours after the events transpired at the Flying J, a Texas Ranger interviewed Vandergriff. Vandergriff waived his rights, and denied any knowledge of the Fort Davis standoff and any knowledge of the blue Oldsmobile. He told the officer that he was riding in the Suburban, and that he was traveling to go hunting for hogs. Not fully satisfied with Vandergriff's explanation, the officers transported Vandergriff to the Reeves County Detention Center.

A background check revealed that Vandergriff had a previous felony conviction for possession of cocaine. In the criminal Complaint, the Government charged Vandergriff with Possession of a Firearm by Felon, 18 U.S.C. § 922(g), because of the weapons found in the trunk of the Oldsmobile. Vandergriff's motion to suppress the evidence found in the Oldsmobile was overruled at trial, and after a jury trial he was convicted and sentenced to 102 months in jail.

At a pre-trial hearing, Vandergriff voiced his intent to represent himself. The district court inquired into Vandergriff's formal education and other training, and ordered a psychiatric examination to determine if he had the mental competency to stand

trial.

Thereafter, the counsel for Vandergriff filed a Motion to Withdraw as Attorney because Vandergriff wrote him a letter instructing him to do so. At a hearing in response to the Motion to Withdraw, Vandergriff seemed to ambiguously assent to be represented by counsel.[2] Soon after this hearing, the Government

---

[2]The following colloquy occurred between the Appellant and the Court:

COURT:        But you indicated that you wanted to charge Mr. Leahey [Vandergriff's attorney] with defamation and slander and a few other things, and that you wanted him to withdraw as counsel in this case. You are aware of that, are you not?
APPELLANT:    Yes, sir, I am.
COURT:        And the reason we have to have this hearing is because I want to know if you still feel that way about getting rid of Mr. Leahey.
APPELLANT:    Okay. Well, sir, a question that would come to my mind first –
COURT:        Yes, sir.
APPELLANT:    Would be if indeed I do recuse Mr. Leahey of my services, would I therefore still be under the contract to have another court appointed attorney?
COURT:        Yes.
APPELLANT:    Assigned by this Court?
COURT:        Yes, sir.
APPELLANT:    So I would not have the choice of standing sui juris or hiring another attorney?
COURT:        You hire anybody you want to, as long as he is a lawyer, Mr. Vandergriff. And certainly if you can afford an attorney, or members of your family can afford an attorney, certainly you have the right to do so. The case is still set for September 8th, you understand, because you are in custody and I can't put it off. But if you want to hire somebody in the place of Mr. Leahey, certainly you may do so.
APPELLANT:    But are you also telling me that I may not proceed sui juris?
COURT:        I am also telling you that you are going to have a lawyer in this courtroom when you go to trial.
APPELLANT:    And that I have no choice in that matter?
COURT:        No, sir, you don't.
APPELLANT:    All right. Then at this point in time I choose to retract the letter that I sent you as well as the motion to dismiss my attorney.

-5-

brought a Motion Urging Reconsideration of Defendant's Motion to Represent Himself at Trial. Specifically, the Government asked the district court to "reconsider its previous order, to conduct an extensive colloquy with Mr. Vandergriff about the pitfalls of self representation, to obtain a knowing and intelligent waiver of counsel, and to appoint standby counsel in case Mr. Vandergriff becomes obstructionist [sic] or changes his mind."

This Motion was heard the day jury selection began in the present case, and the court participated in extensive colloquy with the Appellant.[3] Ultimately, the trial commenced with Vandergriff

---

[3]The following colloquy occurred between the Appellant and the court:

THE COURT: Now let me ask you this, Mr. Vandergriff . . .you indicated to me that you wanted to represent yourself and I attempted to counsel with you and told you I didn't think that was too good of an idea, and you agreed at that time to allow Mr. Leahy to proceed to represent you. Since that time the Federal Government has filed a motion in this Court asking me to reconsider what I did the last time, stating it was their belief that the law in this country is that if one wished to represent himself in a trial he has that absolute right within some constraints, as long as we are not, you know having a big problem in Court and all that sort of stuff. What I need to know in connection with that motion, do you want me, Mr. Vandergriff, to reconsider and let you proceed by yourself or do you want to go ahead and let's go on with Mr. Leahy?

APPELLANT: Okay I want to make this perfectly clear to the Court, and that is that I do not wish to represent myself. I wish to be heard alone, and there is a difference. I only have one counsel and my counsel is Jesus Christ . . . Sir, I wish to be heard by myself. I do not wish to represent myself, I do not wish a lawyer, I wish to be heard by myself.
                              *    *    *
APPELLANT: I have the right to be heard by myself. Okay. Now, that's what I chose to do. However, this man was thrust upon me, I was not informed completely.

-6-

represented by counsel.

When I signed, when I signed that thing saying that I wanted a court appointed attorney, it was never explained to me that once I took an attorney that I could never retract that because you told me last week if I got rid of this guy that you were going to make me take another person, that I would have no choice.

THE COURT: I'm not now.

APPELLANT: You are not now?

THE COURT: If you want to get rid of Mr. Leahey, I'm not going to force another lawyer on you as long as you don't misbehave.

APPELLANT: I don't want to misbehave.

THE COURT: I don't want you to.

Thereafter, the following exchange took place just prior to the beginning of trial:

THE COURT: Mr. Vandergriff, I'm going to bring the jury in in just a moment, but I need to get some sort of a sense of direction as to your participation in the trial. If you don't' want Mr. Leahy, you don't have to have him. I think you probably would be better off to have him, but I'm not trying to keep you from representing yourself. But I don't know who to turn to when it comes to questioning the witnesses, whether you want to do the questioning or you want Mr. Leahy to do it. I don't know whether you want to make an opening statement following the Government's opening statement in this case, Mr. Vandergriff. In order to have an orderly trial I have got to get some sense of direction sir.

APPELLANT: Well, sir, officially I stand on the motion that I served this Court in that I want to stand alone. However, at this point, now that we have already proceeded to this degree, I'm not ready, I'm not prepared to do it on my own. But, you know, for the record, let me state that I did want to assert that right. However, now since we have no time for me to prepare, I have no choice but to stay with the attorney.

THE COURT: How long do you think it would take to prepare?

APPELLANT: There is no telling.

THE COURT: Well, you see, we have got a little problems with that, Mr. Vandergriff, in that we have speedy trial problems and I cannot remand you to the custody of the Marshal, you know, three years to prepare your case. I can't do that.

The Supreme Court recognized in Faretta v. California, 422 U.S. 806 (1975), that the right of self-representation is guaranteed by the Sixth Amendment. The exercise of this right, however, is conditioned on the "knowingly and intelligently" relinquishment of the right to counsel. Chapman v. United States, 553 F.2d 886, 895 (5th Cir. 1977), *citing* Faretta, 422 U.S. at 835; Johnson v. Zerbst, 304 U.S. 458, 464-65 (1938). To this end, a district court should certify that the defendant is aware of the perils of self-representation, and make sure that the record reflects the defendant's voluntary decision. Faretta, 422 U.S. at 835. Essentially, the district court must ensure that the defendant "'knows what he is doing and his choice is made with eyes open.'" Id., *quoting* Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1943). In the present case, Vandergriff's knowing and intelligent waiver of counsel and assertion of his right to represent himself was directly and unequivocally communicated to the district court on three different occasions: At the pretrial hearing, at the hearing of his attorney's Motion to Withdraw, and at the Government's Motion Urging Reconsideration of Defendant's Motion to Represent Himself at Trial.

The nature of the denial of the right of self-representation is different from other constitutional violations, in that the harmless error doctrine does not apply to save the district court's error. As this court stated in Chapman v. United States, the defendant's right to self-representation does not exist to increase the chance of winning his case, but exists because of the "notion

-8-

that each person is ultimately responsible for choosing his own fate." Id. at 891. Therefore, the sole inquiry is not whether the error of denial was harmful, but rather did the court wrongfully deny the defendant his right to represent himself at trial. McKaskle v. Wiggins, 465 U.S. 168, 177 n. 8 (1984). *See also* Chapman, 553 F.2d at 891-92.

Additionally, this court has consistently held that the right to self-representation can be timely asserted anytime before jury is empaneled as long as there is no evidence in the record that assertion of the right was a tactic to secure delay. Chapman, 553 F.2d at 894. Evidence that the request was designed to achieve delay can be inferred from the circumstances surrounding the request, such as a pattern of dilatory conduct by the defendant. United States v. Flewitt, 874 F.2d 669, 675 (9th Cir. 1989).

In the present case, when Vandergriff asserted his right to represent himself on the third occasion, the trial judge found that Vandergriff had knowingly and intelligently waived the right to counsel and asserted the right to self-representation. Accordingly, the trial court informed Vandergriff that the could represent himself. However, when the trial court informed Vandergriff that the trial would commence immediately and refused the defendant's request for time to prepare his case, Vandergriff acquiesced in allowing the government-appointed counsel to represent him. Vandergriff pointed out to the court that at his previous appearance the court had informed him he could not represent himself and for that reason had made no trial

preparations. Under these circumstances, we conclude that Vandergriff did not voluntarily waive his right to self-representation. In forcing Vandergriff, under these circumstances where he was not attempting to secure an unwarranted delay, to accept against his will a government-appointed attorney, the court deprived him of his constitutional right to conduct his own defense.

Accordingly, the judgment before us is vacated and the case is remanded for proceedings not inconsistent with this opinion.

VACATED AND REMANDED